**Shari SHAPIRO–GORDON, Plaintiff,**

v.

**MCI TELECOMMUNICATIONS CORP., Defendant.**

**No. 90 Civ. 4223 (RWS).**

United States District Court, S.D. New York.

Jan. 22, 1993.

Sharfman, Shanman, Poret & Siviglia, P.C. by Daniel A. Ross, of counsel, New York City, for plaintiff.

Orrick, Herrington & Sutcliffe by Michael Delikat, of counsel, New York City, MCI Telecommunications Corp. by Gloria Lett, of counsel, Washington, DC, for defendant.

SWEET, District Judge.

Plaintiff Shari Shapiro Gordon ("Gordon") sued MCI Telecommunications ("MCI") under Title VII of the Civil Rights Act of 1964, as *amended*, 42 U.S.C. § 2000e(j) and under New York Executive Law, § 296(10)(a), alleging that MCI refused to hire her because of her religion. After a two day bench trial and upon the following findings and conclusions, judgment will be entered dismissing the complaint with costs to the defendant.

*Prior Proceedings*

The complaint was filed on June 22, 1990, issue was joined and discovery completed. The trial took place November 18–19, 1992, and final submissions were complete on December 22, 1992.

*The Facts*

At the end of March 1989, Gordon moved to New York from Columbus, Ohio where she had worked at Hyatt Legal Services. Gordon's work hours at Hyatt were Monday through Friday, 9:00 a.m.–5:30 p.m. While at Hyatt Legal Services Gordon did not leave work early on Friday afternoons in order to observe the Sabbath. Although Gordon was Jewish, she was not Sabbath Observant at the time she lived in Ohio. However, early in 1989 she became engaged to the man to whom she was married later in the year after the events in question. He was Sabbath Observant. Gordon decided to become more observant once she moved to New York.

In April 1989, Gordon contacted the employment agency of Bennett & Braun to assist her in finding a job in the field of personnel or human resources. Bennett and Braun had previously been contacted by MCI to seek suitable applicants for the position of Staff Assistant in MCI's New York City Human Resources office. Marc Fiore ("Fiore") of Bennett and Braun discussed the staff assistant opening with Gordon and referred her to MCI.

On April 5, 1989, Gordon interviewed for the Staff Assistant position and met with MCI employees Catthya Britt ("Britt") and Judi Lindower ("Lindower"). Lindower was head of the MCI New York City Human Resources Department. On April 6, 1989, Gordon returned to MCI where she interviewed with Holly Kanski Simboli ("Kanski"), the Staff Assistant Gordon was being interviewed to replace. Kanski and Lindower are Jewish but not Sabbath Observant.

During the MCI interviews, Gordon was told about the requirements of the job. Lindower informed Gordon that the staff assistant job was a hectic position, particularly on the day after payroll checks were distributed (every other Friday) since there were always payroll issues which had to be resolved. Fiore also discussed the requirements of the job with Gordon. Gordon did not mention to anyone at MCI during her three interviews anything about a need to leave early on Fridays.

On April 6, 1989, MCI called Bennett and Braun to extend a job offer to Gordon. After Fiore told Gordon of the job offer, Gordon informed him she was hesitant to accept MCI's offer because she was becoming more observant and might need to leave early on Friday afternoons and would also be needing time off soon after starting a new job to be in the weddings of three friends in Cleveland. Gordon also informed Fiore she would need time off for her own wedding in November, and she was uncertain about how much time she would need off.

After speaking with Gordon, Fiore contacted Lindower. Lindower was informed by Fiore that Gordon was marrying someone who was religious and that she was going to start observing the Sabbath, taking Friday afternoons off before dark to get home before sundown. When Lindower attempted to get additional information from Fiore to ascertain whether or not Gordon would have to leave early on Fridays, Fiore responded that Gordon was herself unsure. Because he could not answer Lindower's questions about Gordon's needs, Fiore suggested that Lindower and Gordon speak directly.

On the morning of April 7, 1989, Gordon and Lindower spoke by telephone. Lindower informed Gordon that she wanted her for the position and wanted to find out more about her needs to leave early on Friday afternoons. Lindower had previously been involved at MCI in accommodating the needs of a Sabbath Observant employee.

Gordon rejected MCI's job offer before Lindower had an opportunity to explore whether an accommodation was possible, indicating that she was not sure what she was going to do and would not have to worry about it for another seven months. Gordon also informed Lindower that she would be needing time off to be in her friends' weddings. Gordon informed Lin-

dower that it probably was not a good time for her to start a new job, and Gordon stated she guessed she was not going to take it.

Lindower did not withdraw the job offer from Gordon, nor did Lindower suggest to Gordon that she compromise her religious beliefs in order to accept the MCI job.

Gordon continued to seek employment diligently, and interviewed with at least nine potential employers (other than MCI) before beginning work on May 8, 1989 in the personnel office of the Standard Chartered Bank, at a salary of $21,000 a year.

Both Lindower or Fiore had direct conversations with Gordon with respect to her intentions. Neither are presently related to MCI in any way, and both were credible witnesses whose testimony was consistent and in direct conflict with Gordon. Gordon's present recollection may well be reinforced by her marriage and her convictions, which may well be stronger in 1992 than in the spring of 1989 after what appears to be a successful and happy marriage of which religious observance is an integral part.

Because payroll discrepancy resolution typically took place all day Friday after payday, Gordon's absence on late Friday afternoons would have created operational problems for MCI since the Human Resources staff was responsible for all personnel matters, including payroll issues for the approximately 400 employees at the several New York offices. There was no overlap in terms of job responsibilities of these three positions.

One of the principal responsibilities of the staff assistant position which was offered to Gordon was reconciliation of payroll issues. MCI employees are paid in the late afternoon (after 3:00 p.m.) every other Thursday, with paychecks generated out of the MCI office in Washington, D.C. Virtually every pay period employees would have issues or disputes concerning their pay (i.e., a paycheck would be lost or issued in the wrong amount). The Staff Assistant was often required to spend all day on the Fridays following a payday resolving payroll problems.

On the rare occasions that Kanski was out during a payweek, under a schedule that was planned well in advance, an employee familiar with the staff assistant job would come down from MCI's Rye Brook office and handle the payroll responsibilities. Many of the payroll issues had to be resolved by the staff assistant by working with MCI's payroll office in Washington, DC, where the employees worked 9:00–5:30.

While the staff assistant had to access to MCI's computer to include information once a payroll problem was resolved, most of the payroll issues could not be corrected by accessing the computer and had to be resolved by working with payroll in Washington, DC, or the commissions department in Rye Brook, New York.

Only Kanski and Lindower had access to the computer system for security reasons because of the confidential nature of the data concerning MCI employees. A temporary employee could not have accessed the computer system for security reasons.

Substitution of Lindower or Britt for the staff assistant every other Friday afternoon for months would have had a detrimental effect on the function of the Human Resources office, since neither Lindower nor Britt had the time or knowledge to resolve the payroll issues.

However, no evidence established that the task of the job offered to Gordon could not have been performed by extra hours Thursday evening, early Friday morning, or during the Friday lunch hour to compensate for early departure Friday afternoon.

The total amount of time that Gordon would have missed on Fridays after payroll, based upon an average commute of one hour from MCI's offices to her home in Forest Hills, is 26 hours, 30 minutes, calculated as follows:

578

| "Payroll" Fridays 1989 | 1989 Candle Lighting Time | Time to Leave MCI's Offices | Time Off Before 5:30 | |
|---|---|---|---|---|
| 10/6 | 6:10 | 4:45 | | 45 min. |
| 10/20 | 5:49 | 4:30 | 1 hr. | |
| 11/3 | 4:30 (Daylight Savings Time has ended) | 3:00 | 2 hr. | 30 min. |
| 11/17 | 4:17 | 2:45 | 2 hr. | 45 min. |
| 12/1 | 4:10 | 2:30 | 3 hr. | |
| 12/15 | 4:10 | 2:30 | 3 hr. | |
| 12/29 | 4:17 | 2:45 | 2 hr. | 45 min. |
| 1/12 | 4:30 | 3:00 | 2 hr. | 30 min. |
| 1/26 | 4:46 | 3:15 | 2 hr. | 15 min. |
| 2/9 | 5:04 | 3:30 | 2 hr. | |
| 2/23 | 5:20 | 4:00 | 1 hr. | 30 min. |
| 3/9 | 5:36 | 4:00 | 1 hr. | 30 min. |
| 3/23 | 5:51 (Daylight Savings resumes 4/1/89) | 4:30 | 1 hr. | |
| | | Total Hours: | 26 hr. | 30 min. |

---

*Conclusions of Law*

■ In order to establish a *prima facie* case of religious discrimination under Title VII, a plaintiff must prove that: (1) she has a sincere religious belief that conflicted with an employment requirement; (2) she informed her prospective employer of her religious views or practices; and (3) she was not hired because of her inability to comply with the conflicting employment requirement. *See Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d 476, 481 (2d Cir.1985), *aff'd and remanded*, 479 U.S. 60, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986); *Anderson v. General Dynamics Convair Aerospace Div.*, 589 F.2d 397, 401 (9th Cir.1978), *cert. denied*, 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979).

■ Gordon was unable to carry her burden of proof with respect to a *prima facie* case of religious discrimination because she was unable to establish the third prong of the *tripartite prima facie* analysis; namely, that she was not hired because MCI refused to accommodate her religious belief.

MCI did not prohibit, prevent or disqualify Gordon from accepting the Staff Assistant position. She rejected MCI's job offer of her own volition before MCI had ample opportunity to fully assess her need for religious accommodation.

■ A religious accommodation causes an "undue hardship" wherever that accommodation results in "more than a *de minimis* cost" to the employer. *Trans World Airlines Inc. v. Hardison*, 432 U.S. 63, 84, 97 S.Ct. 2264, 2277, 53 L.Ed.2d 113 (1977). Thus, to defend successfully against a religious discrimination claim, the employer need demonstrate that the difficulty of the required accommodation is more than *de minimis*. It is possible that overtime on Thursdays, early reporting and lunch time work on Friday could offset the early departure during winter Fridays of some 2–2½ hours before closing.

Gordon also asserted a cause of action under the New York Human Rights Law for unlawful religious discrimination. However, similar to her Title VII claim, she failed to prove her New York Human Rights Law claim. Section 296(10)–(a) of the New York Executive Law makes it an unlawful discriminatory practice "for any employer to prohibit, prevent or disqualify any person from, or otherwise to discriminate against any person in, obtaining or holding employment because of his observ-

ance on any particular day or days or any portion thereof as a Sabbath or other holy day in accordance with the requirements of his religion."

■ Although an employer has an affirmative duty to make reasonable attempts to accommodate the known religious beliefs of its employees, *North Shore University Hospital v. State Human Rights Appeal Board,* 82 A.D.2d 799, 439 N.Y.S.2d 408, 409 (2d Dept.1981), *app. denied,* 56 N.Y.2d 506, 452 N.Y.S.2d 1025, 437 N.E.2d 1160, *app. dismissed,* 459 U.S. 984, 103 S.Ct. 335, 74 L.Ed.2d 379 (1982). "An employee's failure to inform his employer of his religious needs and to assist in the accommodation process may be fatal to the right of the employee to have his beliefs accommodated by his employer and may constitute a waiver of such right," *State Division of Human Rights v. Rochester Products,* 112 A.D.2d 785, 492 N.Y.S.2d 282, 283 (4th Dep't 1985), citing *Chrysler Corp. v. Mann,* 561 F.2d 1282 (8th Cir.1977), *cert. denied,* 434 U.S. 1039, 98 S.Ct. 778, 54 L.Ed.2d 788 (1978); *Matter of Adelson v. New York State Human Rights Appeal Bd.,* 79 A.D.2d 720, 434 N.Y.S.2d 736 (3d Dep't 1980). Gordon did not cooperate with Lindower in her efforts to determine whether a reasonable accommodation was feasible. Gordon, therefore, waived her right to any accommodation under New York Human Rights law.

Gordon has failed to satisfy her burden of persuasion as to her claim of religious discrimination. Gordon has not shown that MCI made her acceptance of the job offer contingent upon her compromising her religious beliefs. Gordon herself rejected MCI's offer.

*Conclusion*

Gordon has failed to establish the merits of her claims and the necessary factual underpinning on the merits. Therefore, this action is dismissed with prejudice with costs.

It is so ordered.